UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| BRANDON N. VAUGHAN | CIVIL ACTION |
| VERSUS | NO. 18-5571 |
| ALLIANCE OFFSHORE, LLC *and* ALLIANCE LIFTBOATS, LLC | SECTION M (3) |

**ORDER & REASONS**

Before the Court is a motion for partial summary judgment filed on behalf of defendants Alliance Offshore, LLC and Alliance Liftboats, LLC (collectively, "Alliance"),[1] to which plaintiff Brandon N. Vaughan ("Vaughan") responds in opposition,[2] and in support of which Alliance replies.[3] Having considered the parties' and the applicable law, the Court issues this Order & Reasons.

**I.  BACKGROUND**

This personal injury action arises out of an incident that occurred aboard the *L/B Memphis* while operating in the Gulf of Mexico on June 2, 2017.  Vaughan, who was working as a seaman for Alliance, alleges he was injured when he picked up an extension cord lying in pooled water that had washed onto the deck during jacking-down operations (whereby a liftboat lowers itself to water level from a heightened, or "jacked-up," position on level with a platform, and uses its buoyancy to push its legs loose from the muddy sea bottom).[4]

---

[1] R. Doc. 26.
[2] R. Doc. 33.
[3] R. Doc. 36.
[4] R. Docs. 1 at 2; 26-3 at 7.

1

Vaughan and another crewmember, Andrew Griffin, were responsible for securing loose items, including drums and trash bags, on the deck prior to jacking down.[5] Although initially secured,[6] a drum and trash bag came loose sometime during the jacking-down operation due to what Vaughan called typical "wave action" on deck.[7] The liftboat was then jacked up in order for Vaughan to re-secure the loose items. Vaughan was re-securing the items when he came across the extension cord in standing water.[8] Vaughan alleges that the liftboat's Captain Brad Lowe ("Captain Lowe") ordered him to pick up the cord.[9] While Vaughan does not himself recall Captain Lowe issuing this instruction,[10] he relies upon fellow crewmember Murray Dorsey's recollection that Captain Lowe directed them to clear the deck.[11] In attempting to coil the cord around his left elbow, Vaughan grasped the female end of the cord with his bare, right hand, immediately sensing a shock and numbness on the right side of his body.[12]

Vaughan says he did not know where or whether the cord was plugged in at the time he grabbed it,[13] but he did not believe the cord was connected to a power source because the indicator light on the end of the cord was not lit.[14] In fact, the cord was plugged into a non-GFCI outlet in the emergency generator room,[15] to which crewmembers like Vaughan had access.[16] Luis Gutierrez and Captain Lowe testified that Proserv, a third-party contractor, owned the cord and

---

[5] *See* R. Docs. 26-3 at 14; 33-4 at 4-5.
[6] R. Doc. 33-4 at 10-11.
[7] R. Doc. 26-3 at 8-9.
[8] *Id.* at 13-16.
[9] R. Doc. 33 at 3; *see* R. Doc. 1 at 2.
[10] R. Doc. 26-3 at 26.
[11] R. Doc. 33 at 3; *see* R. Doc. 33-6 at 5.
[12] R. Doc. 33-4 at 15-17.
[13] R. Doc. 26-3 at 17.
[14] R. Doc. 33-10 at 2; *see* R. Doc. 33-4 at 20.
[15] R. Doc. 33-2 at 5, 10. The acronym GFCI stands for ground-fault circuit interrupter, "a fast-acting circuit breaker designed to shut off electric power in the event of a ground-fault within as little as 1/40 of a second." http://www.osha.gov/SLTC/etools/construction/electrical_incidents/gfci.html (last visited 4/22/19). Courts may take judicial notice of government websites. *See Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005).
[16] R. Doc. 26-4 at 18.

had been using it to power control modules called "Conex boxes" aboard the *Memphis* during the days ahead of the incident.[17] Captain Lowe further testified that he did not know "if Proserv[] undid it from wherever the power source they were using … and dropped it there."[18] Vaughan testified that the cord had been on the deck for a few days before the incident but that he had not seen it plugged into anything during that time.[19]

The parties disagree as to what kind of extension cord Vaughan grasped.[20] Alliance contends that the cord did not have an indicator that would light up when the cord was energized while Vaughan insists that the cord did have such a light.[21] The record reflects other disagreements about the cord's characteristics. Captain Lowe identified an extension cord that was about 25 or 30 feet long,[22] whereas Vaughan said it was "possibly" about 100 feet.[23] When shown a photograph of a cord, Vaughan first agreed that the photograph depicted the extension cord that shocked him, then later disagreed, explaining that the cord in question had a yellow, plastic female end that would light if energized.[24] Still later Vaughan declared that the cord had a clear end.[25]

Alliance had certain policies and procedures in place regarding electrical cords and jacking-down operations. Eric Beasley ("Beasley") testified that, unless an electrical cord needed to be used during jacking operations, it was Alliance's custom to remove and secure cords on deck prior to such operations.[26] Additionally, Alliance's Quality Health, Safety and Environmental Manual ("QHSE Manual") requires the use of GFCI-protected outlets for "temporary wiring

---

[17] R. Docs. 26-4 at 3-5; 26-6 at 2-4.
[18] R. Doc. 26-4 at 5.
[19] R. Doc. 33-4 at 5.
[20] R. Doc. 33 at 14-15.
[21] *See* R. Docs. 33 at 11; 33-4 at 20-21.
[22] R. Doc. 26-4 at 6.
[23] R. Doc. 26-3 at 16.
[24] R. Doc. 33-4 at 20-21.
[25] R. Doc. 33-10 at 2.
[26] R. Doc. 33-5 at 4-5.

outdoors" and when "using electrical equipment around water or in damp environments."[27] However, the QHSE Manual excepted the use of GFCI outlets for "[a]reas where receptacles are required … to supply power to specific equipment (i.e., receptacles dedicated to refrigerators or other heavy equipment)" and for "[l]ine filters and other power supply components in many electronic instruments" that "draw sufficient capacitive current to trip a GFCI."[28] Alliance also provided gloves for a crewmember like Vaughan, but he did not wear them during the incident.[29]

As a result of the accident, Vaughan alleges he suffered injuries that required medical treatment and that prevent him from resuming work. Vaughan contends that Alliance's failure to provide a safe place to work, failure to take proper precautions to prevent the risk of electrical shock, failure to use a GFCI-protected outlet to reduce the risk of electric shock, failure to warn, among other acts and omissions, support his Jones Act and unseaworthiness claims.[30]

## II. PENDING MOTION

In its motion for partial summary judgment, Alliance argues that Vaughan cannot establish either negligence under the Jones Act or unseaworthiness. As to the Jones Act claim, Alliance insists that Vaughan, a trained electrician with two years of experience, was careless in grabbing the submerged electrical cord with his bare hands without first checking to see whether it was energized. Alliance also contends that a GFCI outlet was not required by the QHSE Manual because the cord's use to power Proserv's Conex boxes "seem[s] to fit the [Manual's] exception for 'power supply components in many electronic instruments,' and perhaps also 'heavy equipment.'"[31] Alliance further argues that it had no duty to warn Vaughan of the "open and

---

[27] R. Doc. 33-7 at 4.
[28] R. Doc. 33-9 at 2.
[29] R. Doc. 26-3 at 22.
[30] R. Doc. 1 at 3.
[31] R. Doc. 36 at 6-7.

obvious" danger posed by the wet cord. As for the unseaworthiness claim, Alliance contends that the cord's presence in the puddle was the result of an "isolated, personal negligent act,"[32] not the pervasive acts necessary to establish an unseaworthy condition. Further, Alliance claims that the cord was knocked loose by the items (drum and trash bag) Vaughan was supposed to have secured, making only Vaughan to blame.[33]

Vaughan responds that several disputed issues of material fact preclude summary judgment. In support of his Jones Act claim, Vaughan contends that Alliance has not met its burden of showing the complete absence of its own alleged negligence, pointing to Captain Lowe's order that Vaughan pick up the cord and to Alliance's noncompliance with the QHSE Manual's directive to employ a GFCI outlet.[34] Further, Vaughan says that Alliance has not produced evidence to show that his reliance on the unlit end of the cord was improper.[35] In support of his unseaworthiness claim, Vaughan claims that the presence of the extension cord on deck was more than a mere isolated act of negligence because Beasley testified that, despite the presence of water on deck during jacking-down operations, it was common for extension cords to be on deck, and because Captain Lowe testified that, despite the QHSE Manual's directive to use a GFCI outlet, he did not know why the extension cord was not plugged into one.[36] Finally, Vaughan claims that the parties' disagreement about what kind of cord allegedly shocked Vaughan also precludes summary judgment on both claims.[37]

---

[32] R. Doc. 26-1 at 12 (quoting *Lambert v. Diamond M Drilling Co.*, 688 F.2d 1023, 1024 (5th Cir. 1982)).
[33] *Id.* at 12-13.
[34] R. Doc. 33 at 12-13.
[35] *Id.* at 10-11.
[36] *Id.* at 14-15.
[37] *Id.* at 10, 14-15.

## III. LAW & ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id*. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). The substantive law identifies which facts are material. *Id.* Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Equal Emp't Opportunity Comm'n v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary judgment motion, a court may

6

not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

**B. Jones Act**

The Jones Act provides a cause of action to a "seaman injured in the course of employment." 46 U.S.C. § 30104. "A seaman is entitled to recovery under the Jones Act … if his employer's negligence is the cause, in whole or in part, of his injury." *Gautreaux v. Scurlock*

*Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997) (en banc).[38] "An employer has the duty to provide his seaman employees with a reasonably safe place to work." *Simmons v. Transocean Offshore Deepwater Drilling, Inc.*, 551 F. Supp. 2d 471, 475 (E.D. La. 2008) (citing *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989)). An employer breaches this duty when it fails to act with "ordinary prudence under the circumstances." *Gautreaux*, 107 F.3d at 338. Under the Jones Act, the negligence of a seaman's fellow employee is imputed to the employer. *See Martinez v. Offshore Specialty Fabricators, Inc.*, 481 F. App'x 942, 945 (5th Cir. 2012). While the employer's duty is broad, an employer "must have notice and opportunity to correct an unsafe condition before liability attaches." *Colburn*, 883 F.2d at 374. Therefore, to succeed on a Jones Act claim, "there must be some evidence from which a jury can infer that the unsafe condition existed and that the owner knew or, in the exercise of due care, should have known of it." *Perry v. Morgan Guar. Tr. Co.*, 528 F.2d 1378, 1379 (5th Cir. 1976). However, a plaintiff may satisfy the "featherweight" burden of causation under the Jones Act simply by showing that the employer's "negligence played any part, even the slightest, in producing the injury." *Chisholm v. Sabine Towing & Transp.*, 679 F.2d 60, 62 (5th Cir. 1982) (citations omitted). "Even under the Jones Act, however, a party must establish more than 'but for' causation." *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 302 (5th Cir. 2008).

Like the employer, a seaman must also "act with ordinary prudence." *Gautreaux*, 107 F.3d at 339. A seaman's own negligence does not bar recovery under the Jones Act but "is an affirmative defense that diminishes recovery in proportion to the seaman's fault." *See Johnson*, 544 F.3d at 302. Thus, to defeat a Jones Act claim by way of summary judgment, an employer

---

[38] Vaughan's seaman status is undisputed.

8

"must show that there is no genuine issue of material fact with respect to its own negligence." *Nelton v. Cenac Towing Co., LLC*, 2010 WL 4116851, at *2 (E.D. La. Oct. 19, 2010).

Here, Alliance has not demonstrated that it is completely free of fault as to make appropriate summary judgment in its favor. Alliance contends that Vaughan's own negligence caused his injuries, citing *McFann v. Southwestern Power Electric Co.*, 916 So. 2d 1277, 1284 (La. App. 2005), in which a power company was not held liable for negligence where a fourteen-year-old boy cut its electric wire with pruning shears, under the rationale that the dangers of electricity are "common knowledge." On this basis, Alliance asks, "[i]f a boy of [fourteen] is responsible for his own careless acts with a live wire, shouldn't the same standard apply to a 35-year-old with years of training to be an electrician?"[39] In response, Vaughan says that *McFann*, a Louisiana-state-court case, is inapposite to address the "very light" causation burden applicable in Jones Act cases.[40] The Court agrees. Alliance cannot rely on state law to establish it was free from fault under the Jones Act. *See Bourgeois v. Weber Marine, LLC*, 80 F. Supp. 3d 721, 729 (E.D. La. 2015) ("the Supreme Court has made clear that a maritime tort is 'a type of action which the Constitution has placed under national power to control in its substantive as well as its procedural features'") (quoting *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 409 (1953) (internal quotation omitted)); *see generally* 2 ROBERT FORCE & MARTIN J. NORRIS, THE LAW OF SEAMEN § 30:37 (5th ed. 2018) (discussing four principal differences between Jones Act negligence and ordinary, common-law negligence).

"A shipowner in a Jones Act case has a duty to warn his employees 'in an effective way of dangers not reasonably known.'" *Patterson v. Allseas USA, Inc.*, 137 F. App'x 633, 637 (5th Cir. 2005) (quoting *Davis v. Parkhill-Goodloe Co.*, 302 F.2d 489, 494 (5th Cir. 1962)). Conversely,

---

[39] R. Doc. 26-1 at 9-11.
[40] R. Doc. 33 at 12.

"[t]here is no duty to instruct an experienced seaman on matters within common sense, or to remind him of what he already knew or should have known." *Weary v. Noble Drilling Corp.*, 2006 WL 146201, at *2 (E.D. La. Jan. 19, 2006) (no failure to warn of unsafe condition where employer had no notice of it) (citation omitted). "In other words, shipowners need not warn seamen of dangers that are 'open and obvious.'" *Patterson*, 137 F. App'x at 637 (quoting *Farrell v. United States*, 167 F.2d 781, 783 (2d Cir. 1948)).

In *Patterson*, the Fifth Circuit held that the employer was not liable under the Jones Act for failing to warn an employee about the hazard of descending a port stairway with wet boots. 137 F. App'x at 635, 637-38. The court reasoned that the employee's experience as "the main safety official under the captain," his "intimate[] familiar[ity] with the [vessel]," and his earlier descent of an identical staircase without incident, established that the only danger was the wet condition of his boots. Because "nothing [the employer] knew or could have told [the employee] regarding the dangers of descending the stairway in wet boots would have armed [the employee] with any more knowledge than he had when he walked out of the standing water toward the stairway," the court held that there was no duty to warn of the open and obvious danger. *Id.* at 638.

In this case, it is undisputed that Vaughan was an abled-bodied seaman with two years of training as an electrician. Thus, Vaughan already knew or certainly should have known to check the cord's power source before grabbing its female end from a pool of water. In addition, Vaughan was familiar with the appurtenances of the vessel, as it was his duty to secure them for jacking-down operations, and he had been aboard the *Memphis* for several days before the incident. Consequently, Alliance contends that, as in *Patterson*, there was nothing more it could have told

Vaughan to better inform him of the dangers of touching with his bare hands a potentially live electrical cord lying in standing water.

But this case is distinguishable from *Patterson* because Vaughan here identifies several disputed facts from which a jury could infer Alliance's negligence under the Jones Act in causing Vaughan's injuries. First, Vaughan identifies testimony indicating that the cord had been present on deck for several days and that Captain Lowe ordered Vaughan to pick up the cord. Such evidence may lead a jury to conclude that Alliance had notice and opportunity to correct the unsafe condition. Moreover, even if it were determined that a fellow crewmember was negligent in not securing the cord, that crewmember's negligence would be imputed to the employer, Alliance. While Alliance contends it had no duty to warn Vaughan of the "open and obvious" danger posed by the wet cord, the testimony that Captain Lowe ordered Vaughan to pick up the cord undermines summary judgment for Alliance on this basis. After all, if the danger was open and obvious to Vaughan, it must have been equally open and obvious to Captain Lowe when ordering Vaughan to pick it up. Thus, if Vaughan proves that Captain Lowe ordered him to pick up the electrical cord, a jury could infer either that the danger was not open and obvious to experienced seamen, such as Vaughan and Captain Lowe, thereby leaving Vaughan's claim intact, or, conversely, that the danger was indeed open and obvious making Captain Lowe's order to Vaughan negligent under the Jones Act.

Second, Vaughan points to Captain Lowe's unrefuted testimony that he did not know why a GFCI outlet was not used for the "temporary wiring outdoors" and when "using electrical equipment around water or in damp environments" as required by the QHSE Manual.[41] Although an employer's safety rules do not create a legal duty to abide by them, they are nevertheless

---

[41] R. Doc. 33 at 5.

11

relevant to determining whether the employer breached the standard of care. *Nichols v. Weeks Marine, Inc.*, 513 F. Supp. 2d 627, 636 (E.D. La. 2007); *see also Ober v. Penrod Drilling Co.*, 726 F.2d 1035, 1037 (5th Cir. 1984) (employer's breach of safety rule was evidence of its negligence). Because the cord's exact utility at the time of the incident has not been established, even Alliance hesitates to state that the QHSE Manual definitively excepted Alliance from the Manual's requirement to use a GFCI outlet.[42] Finally, Vaughan has identified a factual dispute as to whether the cord had an indicator light to warn it was energized. These disputed facts are relevant to the determination of Alliance and Vaughan's negligence under the Jones Act, making summary judgment improper at this juncture.[43]

### C. Unseaworthiness

Separate and apart from the employer's duty to provide a safe work environment under the Jones Act is the vessel owner's non-delegable duty to provide its seamen with a seaworthy vessel under general maritime law. *See Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498-500 (1971). "To establish a claim of unseaworthiness, 'the injured seaman must prove that the [vessel] owner has failed to provide a vessel … which is reasonably fit and safe for the purposes for which it is to be used.'" *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002) (quoting *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)). "A vessel's condition of unseaworthiness might arise from any number of circumstances," such as a "condition of the ship, her appurtenances, her cargo, or her crew." *Usner*, 400 U.S. at 499-500. While "an isolated personal negligent act of the

---

[42] *See* R. Doc. 36 at 6-7.
[43] Alternatively, Alliance argues it cannot be held liable for the acts of Proserv, the third-party contractor which owned and operated the cord, citing *McCarroll v. Wood Group Management Services, Inc.*, 561 F. App'x 407, 410 (5th Cir. 2014), and *Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997). R. Doc. 26-1 at 9-12. But *McCarroll* and *Coulter*, cases that address an employer's liability under the Outer Continental Shelf Lands Act, are not applicable to the employer's broad duty under the Jones Act. *See McCarroll*, 561 F. App'x at 409-40; *Coulter*, 117 F.3d at 911; *see also Johnson v. Blue Marlin Servs. of Acadiana, LLC*, 713 F. Supp. 2d 592, 593 (E.D. La. 2010) ("The law is … well-settled that [an employer's] duty includes a duty to inspect third-party property for hazards and to protect the employee for possible defects.").

12

crew" does not render a ship unseaworthy, "pervasive" operational negligence consisting of "a congeries of acts" will. *Daughdrill v. Ocean Drilling & Expl. Co.*, 709 F. Supp. 710, 712 (E.D. La. 1989) (citing *Robinson v. Showa Kaiun K.K.*, 451 F. 2d 688, 690 (5th Cir. 1971)). However, an unseaworthy condition may also arise from a "transitory" condition, such as the temporary presence of oil, water, or other foreign substance. *See Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539 (slime and gurry coating the ship's rail was unseaworthy condition); 2 ROBERT FORCE & MARTIN J. NORRIS, THE LAW OF SEAMEN § 27:6 (5th ed. 2018). Nevertheless, as to a vessel's seaworthiness, "[t]he standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." *Mitchell*, 362 U.S. at 550 (citing *Boudoin v. Lykes Bros. S. S. Co.*, 348 U.S. 336, 339 (1955)).

In terms of the causation necessary to establish a claim of unseaworthiness, a seaman must prove that "(1) the unseaworthiness played a substantial part in bringing about or actually causing the injury and that (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Manderson v. Chet Morrison Contractors, Inc.*, 666 F.3d 373, 380 (5th Cir. 2012) (quoting *Smith v. Trans-World Drilling Co.*, 772 F.2d 157, 162 (5th Cir. 1985)). This standard has been likened to proximate cause and said to be more demanding than that required by the Jones Act. *See id.*; 1 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 6:25 (6th ed. 2018).

Here, Vaughan has presented no evidence to counter Alliance's contention that the cord was an isolated act of negligence similar to that in *Barclay v. Cameron Charter Boats, Inc.*, 2011 WL 2690399 (W.D. La. July 5, 2011). There, the plaintiff tripped over an extension cord that had been placed in the walkway of the galley. The court reasoned, "[r]egardless of the length of time

the extension cord was in place, there was only one act of negligence – placing the extension cord in the walkway of the galley – that allegedly rendered the vessel unseaworthy." *Id.* at *4. As a result, the act was not so pervasive as to establish an unseaworthy condition. Vaughan cites the testimony of Beasley and Captain Lowe, attempting to show that it was Alliance's policy to leave live cords lying about in wet conditions, but their testimony indicates the opposite is true. In fact, Beasely testified that it was Alliance's policy to unplug and stow cords that were not in use during jacking-down operations.[44] Further, Captain Lowe's acknowledgement of noncompliance with the QHSE Manual merely establishes that, while a GFCI outlet might ought to have been used, it was not on this particular occasion. As in *Barclay*, "[r]egardless of the length of time the extension cord was in place, there was only one act of negligence" – here, at most, Captain Lowe's order to Vaughan to pick up the energized cord left on the liftboat's deck during the jacking-down operation – and this one act of negligence does not amount to the "congeries of acts" necessary to establish pervasive operational negligence and thus to sustain a claim for unseaworthiness. *Id.* Therefore, Alliance is entitled to summary judgment on Vaughan's unseaworthiness claim.

## IV. CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS ORDERED** that Alliance's Motion for Partial Summary Judgment is DENIED in part, as to Brandon Vaughan's Jones Act claim, and GRANTED in part, as to Brandon Vaughan's unseaworthiness claim.

New Orleans, Louisiana, this 23rd day of April, 2019.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE

---

[44] R. Doc. 33-5 at 4.